# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                                  No. CR 00-94 BB

JOSEPH R. MARTIN, JR.,

      Defendant.

## COURT'S FINDINGS OF FACT
## AND CONCLUSIONS OF LAW
## AND
## ADJUDICATION OF GUILT

      THIS MATTER came before the Court for a trial to the bench on February 7, 2000, and having adduced evidence and having considered the proposed findings of fact and conclusions of law submitted by both parties, the Court now makes the following findings of fact and conclusions of law:

### Findings of Fact

      1.      Defendant Joseph Raymond Martin, Jr., stated, both through counsel and in person, that he wished to waive a jury trial and be tried by this Court. In response to this Court's specific questions, Defendant stated he knew (a) the difference between a jury trial and a non-jury trial, (b) he was entitled to participate in the selection of the

jury, (c) the jury's verdict would have to be unanimous, and (d) if Defendant waived a jury, this Court alone would determine guilt.

2.      During the summer of 1995, Defendant became increasingly convinced that the federal government was harassing him in connection with an alleged Massachusetts child support obligation. Defendant believed this harassment stemmed from the policies of the federal government and the Republican party in particular.

3.      Defendant telephoned Congressman Schiff's local constituent office in Albuquerque repeatedly about his child support complaints.

4.      Although Defendant testified a male in Congressman Schiff's office was rude and angered him, he began to abuse the Congressman's female receptionists, Jane Altweis and Teresa Sandoval. By August 23, 1995, Defendant had left several voice mail messages for "you donkey ------- whore."

5.      When Defendant's phone calls became abusive, the Congressman's office reported them to the Albuquerque Police Department (the "APD"), which began an investigation.

6.      On the morning of August 24, 1995, Defendant's phone calls became threatening. Defendant told Ms. Altweis he could "put a *[deleted]* bullet in your *[deleted]* head from 500 yards with my rifle. This is not a threat. I will do it" In this

call, Defendant also warned Ms. Altweis that her boss had better wear a bullet proof vest because Defendant was going to take him out over the holidays.

7. Defendant admitted making at least twenty calls to Congressman Schiff's office, but denied making a direct threat to Congressman Schiff. Ms. Altweis testified that although calls during office hours were not recorded, she was certain it was Defendant who made the threatening phone calls. (Defendant also conceded his voice was easily identifiable.) Ms. Altweis testified she was pregnant and found the calls "very upsetting."

8. Ms. Altweis's certainty that Defendant made an actual threat was also corroborated by events at the time. Congressman Schiff's office promptly reported Defendant's direct threat to APD Officer Robbin Burge, who in turn noted it as a new and troubling development in Defendant's pattern of harassing calls. Officer Burge also requested additional patrols around the Congressman's office. Jane Altweis likewise acted on the threat by documenting it at the time, as well as by seeking a police escort to and from her car in the parking place.

9. By August 30, 1995, Officer Burge had obtained a warrant for Defendant on state charges. Gov't Ex. 10. She and APD Officer David P. Reeves arrested Defendant the next day, August 31.

10. Officer Burge tape-recorded most of the conversation that took place in the course of Defendant's arrest. Gov't Ex. 3. The recording confirms that after Officer Burge arrested Defendant, she borrowed an Advice of Rights card from Officer Reeves and read it to Defendant. A careful review of that recording proves Officer Burge advised Defendant that:

    a. He had the right to remain silent;

    b. Anything he said could and would be used against him in a court of law;

    c. He had the right to talk to a lawyer and have that lawyer present during questioning;

    d. If he could not afford a lawyer, one would be appointed for him; and

    e. He could exercise his rights and terminate the interview at any time.

Defendant told Officer Burge he understood the rights that she had explained to him. Defendant said Officer Burge seemed like "a nice girl" and that he would speak with her.

11. In the course of his conversation with Officer Burge, Defendant outlined his problem with the federal government and the Republican Congress:

4

| | |
|---|---|
| Martin: | "But it's that shit that Newt Gingrich keeps on, you know that child support harassment shit, it's the federal government and those people. |
| Officer Burge: | Oh, uh huh. |
| Martin: | Yeah, that's what they are doing to me, they're fucking up my whole life. |
| Officer Burge: | Is Schiff involved in that? |
| Martin: | No, he's not involved in that, but he's a Republican Congressman. You know what I mean. |
| Officer Burge: | Oh, is that why you're bothering him. |
| Martin: | Yes, that's why I'm pissed off. Yes, because I called up trying to get help, right, telling 'em, telling that office that I'm being harassed and you know they won't allow me to work any job or anything and I was willing to pay child support. They said well how much do you owe, they said well being out what you owe, go hire a lawyer. How the hell can I hire a lawyer if they keep on harassing me, you know what I mean? They won't let me work anywhere, they won't let me live anywhere. They keep on harassing me. Every time I try to get a job they run me off the god damn job, well how am I going to hire a lawyer like that? They're a bunch of god damn nitwits. They don't know what the fuck they're doing, just fucking this country all up, it's like, it's like to me it's like communism, worse than communism. |
| Officer Burge: | Well, you don't pick up the phone man and do that. |
| Martin: | I still think he's an asshole and I'll pick up the phone as soon as I get out and still tell him he's a fucking asshole. |
| Officer Burge: | You know what's going to happen, you'll end up right back in jail. |
| Martin: | Well the hell with it. I don't care. They'll leave me alone and let me live and then I'll quit. All's they have to do is just let me work and leave me alone and then I'll quit. |

Gov't Ex. 4 (Transcript of Defendant's Arrest, August 31, 1995) at 10-11.

12. When Officer Burge asked Defendant if he had been telephoning the Congressman "for a long time," Defendant responded, "I think when I get out though I'm going to kill that son of a bitch."

13. In the course of his taped conversation with Officer Burge, Defendant also said, "I think I am. Yes I am. I'll going to go get my rifle and shoot that mother *[deleted]* right through the head. I've had it. I'd rather have them kill me than ... *[unintelligible].*" Gov't Ex. 3.

14. In order to execute the arrest warrant, Officer Burge stopped Defendant in his motor home. As no owner was available to take custody of the motor home, the police had it towed, and inventoried it as part of their standard procedure. As Defendant had previously revealed, the motor home contained two loaded guns. One was a derringer, the other was an SKS rifle with an integral folding bayonet and fixed ten-round clip. Defendant's derringer was loaded with hollow-point bullets. The clip of Defendant's rifle was filled with ammunition, but no bullet was in the firing chamber.

15. The fact Defendant possessed loaded firearms is a significant factor in evaluating the intent of the phone calls.

16. At trial, Defendant spoke of his shooting skill in general, and was quite specific about his SKS:

> Q. And you practice with it, right?
> A. I shoot very well. I used to shoot sometimes 1,000 rounds a week.
> Q. And if you wanted to hit somebody in the head from 500 years you could have done it, couldn't you?
> A. I didn't say that.
> Q. Could you have done it, sir?
> A. Not with that rifle, I won't. That rifle won't reach.
> Q. Well, how far would that rifle reach?
> A. I don't know, maybe 200 yards.

Tr. 124.

17. After Defendant's arrest, he was searched. In the course of that search, a handwritten card with the name "Gingridge" and an area code 404 telephone number was found in Defendant's wallet. Defendant admitted he had been telephoning then-Speaker of the House Gingrich, whom he knew to be a Republican, because "I guess I was upset with what was being done with child support."

18. Defendant testified he did not intend his words to be "taken seriously" and had nothing personally against Congressman Schiff.

19. Based on the competent evidence presented at trial, this Court finds beyond a reasonable doubt that:

    a. Defendant said words that were menacing and could reasonably be considered a threat to murder Congressman Steven Schiff;

7

b. Defendant knowingly and intentionally communicated such; and

c. Defendant said the words with the intent to impede, intimidate or interfere with and retaliate against the Congressman while engaged in the performance of official duties.

**Conclusions of Law**

1. Defendant waived his right to a jury trial knowingly, intelligently, voluntarily, and with the assistance of competent counsel. FED. R. CRIM. P. 23.

2. Officer Burge properly advised Defendant of his constitutional rights before conducting any custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966).

3. Defendant knowingly, intelligently, and voluntarily waived his rights and agreed to speak with Officer Burge. *United States v. Hernandez*, 913 F.2d 1506, 1509-10 (10th Cir. 1990), *cert. denied*, 499 U.S. 908 (1991).

4. At all times pertinent to the Indictment, Congressman Steven Schiff was a federal officer for purposes of 18 U.S.C. § 115.

5. Defendant intentionally and knowingly communicated threats to Congressman Schiff's office.

6. Alleged threats must be considered in light of their entire factual context including the reaction of those receiving the threat. Whether a statement is legally a threat must be determined by the objective standard of whether a reasonable person would foresee the statement as a serious expression of intent to harm. *United States v. Orozco-Santillan*, 903 F.2d 1262 (9th Cir. 1990).

7. Given the pattern of Defendant's persistent harassment, Defendant's statements about having guns and being able to shoot the Congressman or his staff from a distance must be objectively considered as a threat.

8. To establish intent, the Government need only show the threat was intentionally communicated. *Id.; see also United States v. Stevenson*, 126 F.3d 662 (5th Cir. 1997). Mr. Martin intentionally communicated threatening messages to Congressman Schiff's office with the intent to retaliate against the Congressman and his staff for failing to prevent the federal government from harassing Defendant over his alleged violation of Massachusetts child support obligations.

9. Defendant is **GUILTY** as charged of committing a threat against a federal official. 18 U.S.C. § 115; *United States v. McKinney*, 88 F.3d 551 (8th Cir. 1996).

Now, therefore,

**IT IS ADJUDGED** that Defendant JOSEPH R. MARTIN, JR., is **GUILTY** as charged in the Indictment

The Court will set sentencing upon the completion of a presentence report prepared by the U.S. Probation Office.

Dated at Albuquerque this 18th day of February, 2000.

                                                   **BRUCE D. BLACK**
                                                   United States District Judge

Counsel for the Government:

    Robert D. Kimball, Assistant U.S. Attorney, Albuquerque, NM

Counsel for Defendant:

    Jacquelyn Robins, Albuquerque, NM